UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NICOLE MAHRAMUS, | ) | CASE NO. 5:23-cv-01630 |
| Plaintiff, | ) ) | JUDGE JOHN R. ADAMS |
| vs. | ) ) | |
| FRESHMARK, INC. | ) ) | **ORDER AND DECISION** (Resolves Doc. 19) |
| Defendant. | ) | |

This matter is before the Court on Defendant Freshmark, Inc.'s ("Freshmark") motion for summary judgment on Plaintiff Nicole Mahramus's ("Plaintiff") claims. Doc. 19. Plaintiff filed an opposition to Freshmark's motion and a "Cross Motion for Summary Judgment on her Claim Based on the Family Medical Leave Act with Memorandum in Support." Doc. 25. However, the Court ruled that Plaintiff's attempted cross-motion for summary judgment was untimely, and therefore the Court considers the filing solely as an opposition to Freshmark's motion for summary judgment. Doc. 26. The matter is fully briefed. For the following reasons, Freshmark's motion for summary judgment is GRANTED and this matter is DISMISSED.

I.     FACTUAL BACKGROUND

Plaintiff began her employment with Freshmark as a general laborer in a temporary capacity in August of 2018. Doc. 21-1, p. 45. She was hired directly in April of 2019. Doc. 21-1, p. 45. Upon her direct hire, she acknowledged receipt of the employee handbook and certified that she was not disabled. Doc. 21-1, p. 50, 53.

In mid-October 2021, Plaintiff faxed Freshmark a medical provider's note requesting a leave of absence from October 11 through to October 18, 2021, due to an illness. Doc. 21-1, p. 293. Plaintiff did not discuss this request with anyone at Freshmark. Doc. 21-1, p. 60. Plaintiff returned to work after October 18, 2021. Plaintiff was not disciplined or reprimanded in any way

for this period of leave. Doc. 23-1, p. 37. Plaintiff called off work again on October 22, 2021, but did not provide a reason. Doc. 21-1, p. 61.

On October 25, 2021, Plaintiff submitted a complaint to human resources about her immediate supervisor. Doc. 19-2, p. 2-3. After a meeting on the issue, the human resources manager agreed to transfer Plaintiff to another department with a different supervisor starting the next day, October 27, 2021. Doc. 19-2, p. 3. Despite this resolution, Plaintiff failed to report to work on October 27, 2021. Id.

On October 29, 2021, Plaintiff faxed Freshmark a medical provider's note signed by Dr. Michael Chichak to excuse her from work until November 3, 2021. Doc. 19-2, p. 3. This note did not provide a reason for the absence. Id. Freshmark excused this absence. Id.

On November 5, 2021, Plaintiff faxed Freshmark a second medical provider's note from Dr. Chichak, which extended her leave from work through November 11, 2021. Doc. 21-1 p. 79, 295. Plaintiff did not speak with anyone at Freshmark about this absence. Doc. 21-1, p. 80.

On November 11, 2021, Plaintiff met with Brian Soto, a Psychiatric Mental Health Nurse Practitioner ("PMHNP") for a psychological evaluation. Plaintiff was diagnosed with bipolar disorder. Doc. 21-1, p. 81. Brian Soto provided Plaintiff with a note stating:

> Nicole Mahramus is under my psychiatric/mental health care and was seen for evaluation 11/11/21. At this time her condition is not at a functional status for her occupational duties. I recommend she abstain from her usual occupational duties until her condition and symptoms have stabilized to a more functional status.

Doc. 23-1, p. 66. This note did not provide an estimated return date. Plaintiff did not contact anyone at Freshmark about this note. Doc. 19-2, p. 4. On November 15, 2021, Freshmark faxed a disability benefit claim form to Plaintiff's treatment provider. Doc. 23-1, p. 18, 70-71. Freshmark did not receive a response to this fax. Doc. 23-1, p. 18.

On November 29, 2021, while still on medical leave from Freshmark, Plaintiff started a new job with another employer, DATCO Manufacturing, doing similar work as she was performing at Freshmark. Doc. 21-1, p. 317.

On December 2, 2021, at a follow up visit with a medical provider, Plaintiff's provider indicated that her "bipolar was in full remission." Doc. 21-1, p. 104. Plaintiff did not contact Freshmark to return to work or to inform them that she had a new job. Doc. 21-1, p. 105.

On December 13, 2021, due to a lack of communication and documentation, Freshmark sent Plaintiff a letter requesting medical documentation to support her leave of absence. Doc. 19-2, p. 4. Freshmark gave Plaintiff until December 22, 2021 to provide documentation or face termination. Doc. 19-2, p. 4; Doc. 21-1, p. 297. Plaintiff did not respond to the letter, nor did she otherwise contact Freshmark. Doc. 21-1, p. 92. On December 29, 2021, a week after the stated deadline, Freshmark formally terminated Plaintiff. Doc. 21-1, p. 4.

## II.  LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law * * *.

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943–944 (6th Cir. 1990).

A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element

essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–1480 (6th Cir. 1989) (citing *Frito–Lay, Inc. v. Willoughby,* 863 F.2d 1029, 1034 (D.C. Cir. 1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus,* 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

### III. LAW AND ANALYSIS

Plaintiff asserts claims for 1) interference with her rights under the Family Medical Leave Act ("FMLA"), 2) Disability Discrimination in violation of Ohio law, 3) violation of the American with Disabilities Act ("ADA"), 4) Title VII retaliation, and 5) Retaliation under Ohio law. Doc. 1.

#### A. FMLA Claim: Count 1

In her complaint, Plaintiff asserts that she had preexisting issues of chronic anxiety and depression. Doc. 1, ¶7. She asserts that, due to workplace harassment, these issues were exacerbated, causing her to seek medical intervention on November 5, 2021. Doc. 1, ¶8. Plaintiff contends that she was entitled to leave under the FMLA because she suffered from a mental health condition that required the continuing treatment by a health care provider and a period of incapacity. Doc. 25, p. 13.

The Sixth Circuit recognizes two distinct kinds of FMLA claims: (1) FMLA interference; and (2) FMLA retaliation. *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 282 (6th Cir. 2012). The only claim at issue here is FMLA interference.[1]

To satisfy her prima facie burden for an FMLA interference claim under 29 U.S.C. § 2615(a)(1), Plaintiff must show: (1) that she is an eligible employee; (2) that Freshmark was an employer as defined under the FMLA; (3) that Plaintiff was entitled to leave under the FMLA; (4) that Plaintiff gave Freshmark notice of their intentions to take leave; and (5) that Freshmark denied the plaintiff FMLA benefits to which she was entitled. *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th Cir. 2013) (quoting *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005)). The Sixth Circuit has also adopted an interference-by-retaliation theory, which allows the plaintiff to satisfy the fifth element of a prima facie case of interference by showing that "FMLA leave time [was] a negative factor in [a] decision to terminate" an employee. *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007) (quotation omitted) (holding that an interference-by-retaliation theory was a valid form of FMLA interference claim).

To establish that she was entitled to leave under the FMLA, Plaintiff must demonstrate that she was suffering from "a serious health condition that [made her] unable to perform the functions of the position." 29 U.S.C. § 2612(1)(D). Freshmark asserts that the evidence does not show that Plaintiff suffered a "serious health condition" and therefore she was not entitled to leave under the FMLA. Doc. 19-1, p. 14.

---

[1] Under an FMLA Retaliation theory, "a plaintiff must show that (1) [s]he engaged in an activity protected by the Act, (2) this exercise of [her] protected rights was known to the defendant, (3) the defendant thereafter took an employment action adverse to the plaintiff, and (4) there was a causal connection between the protected activity and the adverse employment action." *Tennial v. UPS*, 840 F.3d 292, 308 (6th Cir. 2016) (citing *Arban v. West Publ'g Corp.*,, 345 F.3d 390, 401(6th Cir. 2003)). The parties debate whether Plaintiff pled an FMLA retaliation claim. Even assuming for the sake of this Order that Plaintiff did plead a retaliation claim, Plaintiff cannot establish that she was entitled to FMLA leave for interference purposes, and therefore, she cannot establish that she was engaged in a protected act for FMLA retaliation purposes.

Plaintiff "must show that she was prevented from working because of the injury or illness based on a medical provider's assessment of the claimed condition." *Olsen v. Ohio Bell Edison Co.*, 979 F. Supp. 1159, 1166 (N.D. Ohio 1997). Regarding the condition,

> Congress did not intend to include within the FMLA's protections 'minor illnesses which last only a few days and surgical procedures which typically do not require hospitalization and require only a brief recovery period.' H.R.Rep. No.8, 103rd Cong., 1st Sess., pt. 1 at 29 (1993). The slings and arrows of everyday life, in Congress' view, should not be the stuff of a federal statute, nor federal litigation based on it. Rather, Congress believed that quotidian afflictions like the common cold or flu should 'be covered by even the most modest of employer sick leave policies' and chose not to legislate in that area. Id.

*Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1163. Thus, it follows that Plaintiff must point to evidence that her medical issues were more than a minor illness and that her provider assessed her condition and determined that she could not work due to that medical issue.

In opposition, Plaintiff points only to her own deposition testimony to establish that she

> clearly described a situation of her mental conditions leading to her being unable to return to Freshmark due to conditions of bullying and intimidation particular to that job and the affect that had on her high blood pressure and pre-existing mental conditions. (Mahramus TR 54-55, 61, 100-05) Mahramus had chronic serious health conditions that caused her to unable to perform the essential functions of her position at Freshmark for the relevant period of time.

Doc. 25, p. 7.

At the outset, the Court notes that Plaintiff has failed to present any medical evidence to support her claim.[2] This Court has previously found that "there is an abundance of case law that makes it clear that [Plaintiff's] own subjective assessment of [her] health cannot be used to demonstrate a serious health condition." *Huberty v. Time Warner Entm't Co.*, 2012 U.S. Dist

---

[2] At the initial case management conference, the Court ordered Plaintiff to provide Freshmark a full medical release including the names and contact information for her medical providers for the previous five years. Doc. 10, p. 1. The parties never raised an issue with the Court regarding obtaining or providing medical records, and it appears from Plaintiff's deposition that Freshmark's counsel had received at least some medical records. Doc. 21-1, p. 94. However, not a single record was entered into evidence or otherwise provided to this Court for review for summary judgment purposes.

LEXIS 15571, *9-10 (N.D. Ohio Feb. 8, 2012). This Court further explained that "[a] colleague on this Court has noted as follows with respect to this burden:

> It does not mean that, in the employee's own judgment, he or she should not work, or even that it was uncomfortable or inconvenient for the employee to have to work. Rather, it means that a 'health care provider' has determined that, in his or her professional medical judgment, the employee *cannot* work (or could not have worked) *because* of the illness. If it were otherwise, a note from a spouse, parent, or even one's own claim that one cannot work because of illness would suffice. Given the legislative history surrounding its enactment, the FMLA cannot be understood to establish such liberal standards for its application.

Id. (quoting *Olsen v. Ohio Edison Co.*, 979 F.Supp. 1159, 1166 (N.D.Ohio 1997) (citation omitted) (emphasis sic).

The Court recognizes that Plaintiff was shown some medical records at her deposition and testified to some of the contents. However, as set forth below, Plaintiff often could not remember dates of treatment, with whom she treated and why. Plaintiff's testimony as to her visits to her medical providers and what the visits were for is inconsistent. Plaintiff contradicted herself throughout her deposition, and often could not recall basic information about the time period in question. Because it is unsupported by medical documentation, it is impossible for this Court to determine even the most basic facts of Plaintiff's purported illnesses and medical care.

1. **The Evidence Before the Court**

Plaintiff stated that she had high blood pressure for about seven years, but that it did not have an impact on her when she was working. Doc. 21-1, p. 23.[3] She further testified that in or around 1988 she "was thought to be schizophrenic. And then, I was de-diagnosed." Doc. 21-1, p. 25. She explained that she received federal disability benefits until 2000, when she was told by her

---

[3] The only medical conditions referenced in Plaintiff's complaint are "preexisting chronic anxiety and depression." Doc. 1, ¶¶7, 8.

medical provider that "I was not schizophrenic anyway." Doc. 21-1, p. 28. She did not receive any further diagnoses. Id.

The Court notes that when Plaintiff began her employment with Freshmark on April 1, 2019, she verified that she did not have a disability. Doc. 21-1, p. 292. She testified that she believed that she became disabled in mid-October of 2021. Doc. 21-1, p. 54. She testified that she was feeling stress in October of 2021. Doc. 21-1, p. 55. Plaintiff contends that she "gave lawful notice of her need to take leave" as required by the FMLA on three separate occasions: October 29, 2021, November 5, 2021, and November 11, 2021. Doc. 25, p. 8.

On October 13, 2021, Plaintiff's doctor faxed a form letter to Freshmark to excuse her from work. Id. This form consisted of two check boxes asking to "please excuse" Plaintiff from work due to illness from October 11, 2021 to October 18, 2021. Doc. 21-1, p. 293. It is not on letterhead, nor does it indicate that it is from a medical office, but it is signed by a Certified Nurse Practitioner. Id. Plaintiff did not discuss this note with anyone at Freshmark. Doc. 21-1, p. 60. Plaintiff testified that at this time that she was experiencing stress because of the way her supervisor was treating her and that she sought medical treatment. Doc. 21-1, p. 55. She explained that she scratched her acne with an abrasive cloth, and she did not want her supervisor to see the scabs, so she sought medical care and asked for time off. Id., p. 56. Plaintiff confirmed that she was able to work in mid-October of 2021, but did not want anyone to see her abrasions. Id., p. 57. Plaintiff returned to work after October 18, 2021. Plaintiff was not disciplined or reprimanded in any way for this period of leave. Doc. 23-1, p. 37.

On October 22, 2021, Plaintiff left a voicemail at Freshmark to call off work. She did not give a reason in the voicemail but testified that she called off because her supervisor "had been humiliating me." Doc. 21-1, p. 61.

Plaintiff explained that on October 29, 2021 she went to a new psychiatrist for an intake appointment and was told her blood pressure was very high. Doc. 21-1, p. 75, 101. Accordingly, Dr. Chichak wrote a letter on medical office letterhead to Freshmark stating only "Nicole is to be excused from work through 11/3/21". Doc. 23-1, p. 64. Plaintiff testified that Dr. Chichak told her to return in a week to see if her blood pressure went down. Doc. 21-1, p. 75. Plaintiff faxed this letter to Freshmark but did not discuss any of this with anyone. Id.

Plaintiff testified that on November 5, 2021, she returned to Dr. Chichak to check her blood pressure. Doc. 21-1, p. 79. Plaintiff testified that her blood pressure was even higher, and therefore Dr. Chichak gave her a letter on the same letterhead stating, "Nicole is to be excused from work through 11/11/21." Doc. 21-1, p. 79, 295. Plaintiff faxed the letter to Freshmark but did not speak with anyone. Doc. 21-1, p. 80.

Plaintiff testified that on November 11, 2021, she had a remote visit with her mental health care provider, Brian Soto[4], for a psychological evaluation.[5] Doc. 21-1, p. 102. Plaintiff confirmed

---

[4] The Court notes that counsel and Plaintiff refer to Brian Soto as "Dr. DeSoto" or "Dr. Soto" throughout her deposition and in her briefing. Plaintiff testified that "Dr. Soto" is a psychiatrist. Doc. 21-1, p. 81. However, the provider note is signed by Brian Soto, PMHNP. The Court takes judicial notice that a PMHNP is a Psychiatric Mental Health Nurse Practitioner. While it is understandable that a patient might not know all their care providers credentials, this highlights the necessity of the medical records. Without these records, the Court cannot confirm even such basic information as the names and credentials of Plaintiff's treating providers. This calls Plaintiff's testimony of her medical care into question.

[5] As an example of the need for medical documentation to verify basic facts, Plaintiff's testimony varied when discussing when she first sought treatment for her mental health. When Freshmark's counsel questioned Plaintiff about her first visit at Ohio ONE Health for her mental health, the following exchange occurred between Plaintiff, her counsel and defense counsel:

> Q Okay. And that first visit that you had at Ohio ONE Health, for your mental health, was on November 11th of 2021?
> A No, November 3rd.
> Q November 3rd. Are you sure it was the 3rd, or was it the 5th? I'm not asking you. I'm asking -
> MR. REEVE: You already asked her about this previously. And she testified that she saw them October 29th, based on the document and based on her testimony.
> MS. KRISTAN: That's not what she testified to.
> MR. REEVE: Yes, it is. You asked her, "'Did you see them that day?'" And she said, "'Yes.'"
> MS. KIRSTAN: My question is slightly different. And I ask you to not answer for the witness.
> MR. REEVE: I'm saying asked and answered.

that she agreed with the treatment notes from that appointment stating that she presented with anxious and tearful thoughts, depressed mood, difficulty concentrating, excessive worry, paranoia, racing thoughts and restlessness. Id. Plaintiff confirmed that she told Brian Soto that her grandmother and her paternal aunt had bipolar disorder. Doc. 21-1, p. 103. Plaintiff testified that she received a bipolar diagnosis at this appointment. Doc. 21-1, p. 81. At some point, Plaintiff "tried some medication", but when asked if she recalled the medication, she stated only "[t]hat commercial heart attack or something." Doc. 21-1, p. 103. It is unclear whether this medication was for her bipolar diagnosis, the earlier high blood pressure issues, or for something else. Doc. 21-1, p. 103. Plaintiff did not recall if she discussed her ability to work with Brian Soto at this appointment, nor did she have any understanding of how long she would be off work or the status of her employment. Doc. 21-1, p. 82. On November 11, 2021, Brian Soto provided Plaintiff with a note stating:

> Nicole Mahramus is under my psychiatric/mental health care and was seen for evaluation 11/11/21. At this time her condition is not at a functional status for her occupational duties. I recommend she abstain from her usual occupational duties until her condition and symptoms have stabilized to a more functional status.

Plaintiff testified that she did not know if she intended to go back to work at Freshmark. Doc. 21-1, p. 84. On November 15, 2021, Freshmark faxed the disability benefit claim form to Plaintiff's treatment provider. Doc. 23-1, p. 18, 70-71. Plaintiff testified that she contacted MANCAN, a temporary staffing agency, to look for new work in the last week of November. Doc. 21-1, p. 107. MANCAN records establish that they checked Plaintiff's eligibility for employment

---

       Q When do you think you first sought treatment for mental health problems at Youngstown Community Health Center?
       A November 3rd.

Doc .21-1, p. 100-101. Again, without the actual medical record, Plaintiff fails to establish when she first sought treatment for her mental health.

on November 24, 2021. Doc. 21-1, p. 319. Plaintiff was placed on the paint line at DATCO Manufacturing and started her new employment on November 29, 2021. Doc. 21-1, p. 317.

Plaintiff testified that on December 2, 2021, she attended a follow up visit with a health care provider, but she does not say with whom she was treating. Doc. 21-1, p. 103. When asked if this visit was a follow up "for the bipolar" she stated that she did not know. Doc. 21-1, p. 103. She testified that she informed the provider that she was taking her medication without any side effects but does not indicate what this medication was for or when it was prescribed. Doc. 21-1, p. 103. Plaintiff reported that her "mood was more stable, less depressed, less worried, less anxious and irritable." Doc. 21-1, p. 104. Plaintiff confirmed that she reported to Brian Soto at the December 2, 2021 appointment that she "started a new job at a paint line full-time and was progressing well at work." Doc. 21-1, p. 104. Plaintiff confirmed that as of December 2, 2021 she was working full-time on the paint line at DATCO and that she was able to work fulltime. Id. Finally, Plaintiff confirmed that her medical record from that visit indicates that her "bipolar was in full remission". Doc. 21-1, p. 105. Plaintiff confirmed that she did not inform Freshmark that she had obtained a new job. Id. Plaintiff contends that, despite working a new full-time job, she called Freshmark twice at some point in December to get FMLA forms but could not remember when. Doc. 21-1, p. 87.

Plaintiff testified that she did not receive the December 13, 2021 letter from Freshmark until "after dark on the 21st". Doc. 21-1, p. 92. She did not call Freshmark Id. Despite not hearing from her, Freshmark gave Plaintiff additional time to provide the medical documentation. Doc. 21-1, p. 4. Plaintiff did not provide the documentation. Plaintiff was formally terminated on December 29, 2021. Doc. 21-1, p. 4.

The above discussion highlights the need for medical documentation to support Plaintiff's subjective testimony that she suffered from a "serious health condition" such that she was entitled to FMLA leave. The summary medical provider notes do not contain any information that Plaintiff could not work because of her mental health issues. The first three notes only seek to excuse Plaintiff from work, with no indication that the need for the absences was for something other than "quotidian afflictions like the common cold or flu." *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1163. The final note summarily states that Plaintiff was seen for an evaluation and "her condition is not at a functional status for her occupational duties" and recommends that Plaintiff abstain from her "usual occupational duties until her condition and symptoms have stabilized to a more functional status." Doc. 23-1, p. 66. It does not set forth what the condition is, what the evaluation consisted of, or what her symptoms were. It does not establish, without more, that a medical provider determined that Plaintiff could not work because of her mental health issues. Finally, Plaintiff's own testimony establishes that she had obtained alternative full-time employment less than two weeks after she submitted Brian Soto's medical note to Freshmark, evidencing that she was in fact capable of working.

For the reasons set forth above, Plaintiff fails point to a genuine issue of material fact that she had a serious medical condition qualifying her for leave under the FLMA. Accordingly, Plaintiff's FMLA claim under either theory fails as a matter of law. Accordingly, Freshmark's motion for summary judgment on this issue is granted.

**B.      Plaintiff's Disability Claims: Counts 2 and 3**

Plaintiff asserts that Freshmark discriminated against her for having a disability in violation of Ohio law and the Americans with Disability Act ("ADA") [6]. Doc. 1, p. 4, 5. Specifically, Plaintiff contends that Freshmark discriminated against her by "targeting her disability and refused to reasonably accommodate her need for absence for treatment." Doc. 1, ¶28, 35. Plaintiff states that her disability was depression and anxiety that were severe enough to limit her work options. Doc. 1, ¶33.

The ADA prohibits a covered employer from discriminating against a "qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A prima facie case of disability discrimination under the ADA requires that a plaintiff show: "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; 3) suffered an adverse employment action decision; 4) the employer knew or had reason to know of the plaintiff's disability; and 5) the position remained open while the employer sought other applicants or the individual was replaced." *Whitfield v. Tennessee*, 639 F.3d 253, 258-59 (6th Cir. 2011) (quoting *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 365 (6th Cir. 2007)).

ADA defines disability as a "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" include, among others, "walking, standing, lifting, bending, ... and working." 42 U.S.C. §

---

[6] Ohio law mirrors the ADA and Ohio courts look to federal interpretation for guidance; as such, this Court will apply the legal standard under the ADA to Plaintiff's claims of disability discrimination under both state and federal law. *King v. Steward Trumbull Memorial Hospital, Inc.*, 30 F.4th 551, 560 (6th Cir. 2022).

12102(2). To determine whether an impairment substantially limits a major life activity within the meaning of ADA, the Court considers the following three factors: "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment, and (3) the permanent or long-term impact of the impairment." *Cardenas-Meade v. Pfizer, Inc.,* 510 Fed. Appx. 367, 370 (6th Cir. 2013).

The Court finds no genuine issue of fact regarding Plaintiff's alleged disability. In her opposition, Plaintiff argues that her "mental issues, as well as her tendency toward extremely high blood pressure when put under mental strain, appear to be both incurable, very limiting during flare-ups, and possibly life threatening (e.g. trips to the hospital) and therefore are both disabilities under the ADA and Ohio state law." Doc. 25, p. 12. Plaintiff further contends that her "flare-ups included substantial limitations in her mental and physical state, as verified by her treating caregivers." There is nothing in the record to support this claim, which is clear from the fact that Plaintiff only cites to the three medical provider's notes, two of which give no details whatsoever regarding the reason for the requested leave. Doc. 20-1, p. 294, 95. While the third note does state that Plaintiff had been seen for a psychiatric/mental health evaluation and was "at this time" "not at a functional status for her occupational duties" this does not support a conclusion that 1) her mental health issues were long term or reoccurring, 2) that they were incurable, or 3) that they are life threatening.

As noted above, Plaintiff failed to produce any medical records to support her claim and instead relies solely on her own inconsistent testimony. Plaintiff failed to provide any evidence to show that she was disabled such that she suffered a physical impairment that substantially limited a major life activity. She did not present any evidence that would demonstrate the nature and

severity of her impairment, or even a diagnosis consistent with the allegations in her complaint.[7] Plaintiff testified that she was able to work, Doc. 21-1, p. 57, and in fact found alternative full-time employment while she purported to be seeking treatment for a mental health issue, Doc. 21-1, p. 78. Also as noted above, Plaintiff testified that the first few weeks of leave were due to skin issues and high blood pressure. Absent any evidence that shows that Plaintiff suffered from a disability as set forth in her complaint, Plaintiff failed to point to a genuine issue of material fact that should be resolved by a jury, and, therefore, she failed to meet the first element of the *prima facie case*. Thus, Freshmark is entitled to summary judgment on these grounds.

C. **Plaintiff's Retaliation Claims: Counts 4 and 5**

Plaintiff asserts that Freshmark retaliated against her for making complaints of gender discrimination in violation of Ohio law and Title VII of the Civil Rights Act of 1964.[8] Doc. 1, p. 5, 6. Specifically, Plaintiff contends that she "was being harassed in the workplace because of her gender during the year 202[1] and lodge a complaint with Freshmark's Human Resources department about harassment on October 25, 2021. Nothing was done to remedy the situation." Doc. 1, ¶6.

To establish a prima facie case of retaliation, the plaintiff show: (1) she was engaged in a protected activity; (2) her exercise of the protected activity was known to Freshmark; (3) the plaintiff was subjected to an adverse employment action; and (4) a causal connection existed

---

[7] There is no testimony that Plaintiff was diagnosed with depression or anxiety. As noted above, Plaintiff's testimony is inconsistent regarding when and for what purpose she sought treatment. This inconsistency is compounded by the fact that Plaintiff has failed to produce any medical records to establish the timeframe of her purported mental health issues.
[8] The court's analysis of the Title VII retaliation claim is the same as its analysis under Ohio law and will thus be merged for the purposes of this opinion. *Thompson v. UHHS Richmond Heights Hosp., Inc.*, 372 Fed. Appx. 620, 623 (6th Cir. 2010).

between the protected activity and the adverse employment action. *Kirkland v. James*, 657 Fed. App'x 580, 585 (6th Cir. 2016).

Freshmark contends that Plaintiff's October 25, 2021 complaint ("the October Complaint") did not constitute a protected activity for the purposes of her Title VII retaliation claim because it did "not raise a single inference of discriminatory conduct based on a protected characteristic." Doc. 19-1, p. 19. This Court agrees.

A person is engaged in a protected activity when they make a complaint that "take[s] an overt stand against suspected illegal discriminatory action." *Blizzard v. Marion Tech. College*, 698 F.3d 275 (6th Cir. 2012) (quoting *Coch v. Gem Indus.*, 2005 Ohio 3045, 2005 WL 1414454, at *5 (Ohio Ct. App. 2005) (quotation omitted)). Specifically, a complaint must object to discriminatory conduct "based on . . . membership of a protected class." *Balding-Margolis v. Cleveland Arcade*, 352 Fed. App'x 35, 45 (6th Cir. 2009). It is not enough for a complaint to contain "a vague charge of discrimination . . . to constitute opposition to constitute [a protected activity]." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989).

In the instance case, Plaintiff's October Complaint did not contain even a "vague charge of discrimination" based on gender. Rather, it was simply a complaint about how she felt her female supervisor, Melody Alflen treated her. "I am forwarding my concern and calling your attention to instances where Melody has made me feel like I work in a negative and toxic environment." Doc. 23-1, p. 68. She then sets forth three instances where her Alflen yelled at her. The first instance was when her line shut off and she told Alflen maybe her male coworker accidentally pulled the stop cord. Plaintiff complained that Alflen yelled at her that she had shut down the line. Doc. 23-1, p. 68. The next instance was when a male coworker took boxes out of her hand and gave them to another male coworker. She complained that she then turned around to see Alflen moving fast

toward her, with her finger pointed and then yelled at her. Id. She next alleges that a male coworker came at her while removing his gloves, that she helped for help, and he called her a "b". Id. The last instance was when Alflen yelled at her to finish emptying a conveyor belt before she went to lunch. Id. While the underlying situations might have included men, the complaint is focused on how Alflen treated her. Plaintiff confirmed that the October Complaint was about Alflen and makes no connection that this treatment was based on gender. Doc. 21-1, p. 174.

Freshmark's Human Resources Director, Kelly Ylonen, met with Plaintiff on October 26, 2021 to discuss the October Complaint. Doc. 19-2, p. 3. "During the meeting, Plaintiff made clear that her allegations were against Ms. Alflen only, not any other employee or manager. She also made no indication that her complaints were attributed to her gender." Id. Plaintiff informed Ylonen that she could not work with Alflen. Doc. 23-1, p. 33. Ylonen explained that she informed Plaintiff that they were investigating the October Complaint, but in the meantime would transfer her to a different department so that she no longer worked with Alflen. Plaintiff agreed to the transfer, where she was expected to start the next day. Doc. 19-2, p. 3. However, Plaintiff did not report to work. Doc. 19-2, p. 3.

Ylonen met with Alflen and "at least two other witnesses" during her investigation of the October Complaint. Doc. 19-2, p. 3. Alflen "denied all of Plaintiff's claims and seemed particularly troubled by the accusations being made against her. Furthermore, other witnesses could not substantiate any portion of Plaintiff's complaint." Id. Accordingly, Ylonen concluded that the October Complaint was the result of an interpersonal conflict between Plaintiff and Alflen, "unrelated to any protected characteristic." Id.

Plaintiff fails to point to anything in evidence to establish a genuine issue of material fact that the October Complaint constituted a "protected act" for purposes of Title VII and/or Ohio law. As such, Freshmark is entitled to summary judgment on these grounds.

IV.     **CONCLUSION**

For the foregoing reasons, Freshmark's motion for summary judgment is GRANTED and this matter is DISMISSED.

**IT IS SO ORDERED.**

| | |
|---|---|
| **March 26, 2025** | **/s/ John R. Adams** |
| **Date** | **John R. Adams** |
| | **U.S. District Judge** |